# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# LAFAYETTE DIVISION

Castille et al                                    Civil Action No. 12-02892

versus                                            Magistrate Judge Carol B. Whitehurst

Apache Deepwater LLC et al                        By Consent of the Parties

## MEMORANDUM RULING

Before the Court is a Motion For Summary Judgment filed by defendant, Apache Deepwater, LLC ("Apache"), [Rec. Doc. 161], Rory L. Castille and Natasha Castille's Opposition Memorandum [Rec. Doc. 169-8] and Apache's Reply thereto [Rec. Doc. 176]. For the following reasons, Apache's Motion will be denied.

### *I. Background*

This action arises out of an accident on October 13, 2012, in which Rory Castille (hereinafter "Castille") sustained personal injuries and damages while working on Apache's West Cameron 111-F unmanned satellite production platform ("WC 111-F") on the Outer Continental Shelf. At the time of the accident, Castille was employed by Total Safety, Inc. ("Total Safety") as a technician for navigational aids and fire-fighting equipment. Castille alleges he was injured when, after opening the door to the wellhead master control panel ("MCP") WC 111-F, he was engulfed by a flash fire. *R. 1, ¶*.

The plaintiffs brought this suit on November 14, 2012, naming Apache as the

owner of WC 111-F.[1] The plaintiffs claimed that as a result of Apache's negligence, Castille suffered and will continue to suffer bodily injuries, physical pain and mental anguish, physical impairment and disfigurement, loss of earnings, and medical expenses. *Id at ¶9.* Natasha Castille alleged a loss of consortium claim. *Id at ¶ 10.*

The record indicates that Mariner Energy, Inc. ("Mariner") was the previous owner of the WC 111-F. Mariner and Total Safety entered into a Master Service Contract ("MSA") on March 18, 2004, in which Total Safety agreed to provide personnel to work on Mariner's offshore oil and gas platforms. *R. 161-4, MSA; R. 161-2, Apache's Stmt of Uncontested Material Facts; R. 169-8, p. 7.* On November 10, 2010, Apache purchased Mariner and thereby acquired all of its oil and gas assets in the Gulf of Mexico. *R. 161-5; R. 161-2; R. 169-8, p. 7.* As the result of the purchase, Apache "succeeded to all of Mariner's rights and/or obligations pursuant to any and all contracts previously entered into by Mariner," including those rights

---

[1] Plaintiffs also named Island Operating Company, Inc in the original Complaint. *R. 1.* Plaintiffs later filed multiple amended complaints alleging liability against the following party-defendants: Haskel International, Inc., as the manufacturer of the pump supply regulator, *R. 21*; Norgren, Inc. and/or Norgren, USA, as the manufacturer of the plastic regulator which allows pressure to flow to the Haskel pump; Vastar Resources, Inc. and/or BP America Production Company ("BP"), as the original owner of the WC 111-F platform, *R. 33*; Control Concepts, Inc. ("Control Concepts") and Linear Controls, Inc. ("Linear"), entities retained by Apache to inspect and/or repair the inside of the MCP on the WC 111-F platform, *R. 73*; and W-Industries of Louisiana, d/b/a Control Concepts and Technology ("W-Industries"), as the manufacturer of the MCP on the WC 111-F platform and was retained by Apache to inspect, and/or repair the inside of the MCP on 111-F, *see R. 81, 132*. At the time of this ruling, all party-defendants had been dismissed except Apache and BP.

pursuant to the MSA between Mariner and Total Safety. *R. 161-4; R. 161-2; R. 169-8, p. 7.* On August 10, 2011, Apache advised Total Safety of the Apache/Mariner merger and informed Total Safety that "all future work for the Apache Deepwater Region will be performed according to the terms of this agreement [the MSA]." *Id.*

Section 8 of the MSA, <u>INDEPENDENT CONTRACTOR</u>, cited by both parties, states:

> 8.1 Contractor [in this case as "Total Safety"] shall be an independent contractor with respect to the performance of all work provided and services rendered hereunder, and neither Contractor nor anyone employed or engaged by Contractor shall be deemed for any purpose to be the employee, agent, servant, or representative of Mariner in the performance of any work or service or part thereof in any manner. Mariner [in this case "Apache"] shall have· no direction or control over Contractor or its employees, agents, contractors, or subcontractors except in the results to be obtained. The work and services contemplated herein shall meet the approval of Mariner and shall be subject to Mariner's general right of inspection to assure the satisfactory completion thereof. The actual performance and supervision of all work and services rendered or to be provided hereunder shall be by Contractor, but Mariner or its representatives shall have reasonable access to all jobsites, locations, and operations to determine whether work is being performed and services rendered by or on behalf of Contractor in accordance with all terms and conditions of this Contract and applicable work and purchase orders.

> 8.2  The parties recognize, acknowledge, and agree that the work being performed by Contractor and its subcontractors are an integral part of and essential to the ability of Mariner to generate its goods, products and services. To the extent the Louisiana Workers' Compensation Act is applicable, the employees of Contractor whether direct, statutory, borrowed or otherwise, are therefore statutory employees of Mariner in accordance with the Louisiana Workers' Compensation Act. It is agreed that any compensation payment due to Contractor's or its subcontractor's employees under the Louisiana Workers' Compensation Act shall be paid solely by Contractor [Total Safety] or its insurers without any right of contribution, statutory or otherwise, from Mariner.

*R. 161-4; R. 169-8, pp. 7-8.*

## *II. Summary Judgment Standard*

Summary judgment will be granted only if the pleadings, depositions, answers to interrogatories, and admissions, together with affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed R. Civ P. 56(c); *Brown v. City of Houston*, 337 F.3d 539, 540–41 (5th Cir.2003). Before granting a motion for summary judgment, the court must be satisfied that no reasonable trier of fact could find in favor of the nonmoving party. *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969) (stating that "the facts and inferences [must] point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict"); *McCarty v. Vastar Res., Inc.*, 2002 WL 1837918, at *2 (E.D.La. Aug. 8,

2002). In determining whether a material issue of fact exists, the evidence and all inferences drawn therefrom must be considered in the light most favorable to the non-moving party. *Baker v. American Airlines, Inc.*, 430 F.3d 750, 753 (5th Cir.2005). Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir.2002).

### *III. Analysis*

Apache filed the instant Motion for Summary Judgment seeking summary judgment in its favor and dismissal of Castille's claims against it, arguing that at the time of the accident, Apache was Castille's borrowing employer under La. R.S. 23:1031(C), immunizing Apache from liability and limiting Castille's recovery to that available under Louisiana's workers' compensation laws.[2] Plaintiffs oppose the motion, arguing that the MSA in question makes the following clear: Castille was not deemed to be the employee of Apache; Apache had no direction or control over Castille; and Castille was considered an independent contractor. Plaintiffs further

---

[2] Apache's Motion for Summary Judgment also asserted that Castille was Apache's statutory employer within the contemplation of La. R.S. 23:1061. *R. 161-1.* In its Reply brief, however, Apache requested that the Court "hold in abeyance" the issue of whether Apache was Castille's statutory employer at the time of the accident. *R. 176, fn 1.*

argue that the clear language of the MSA, as well as an evaluation of the facts surrounding Castille's relationship with Apache, present multiple issues of material fact as to Apache's borrowed employee motion.

Under Louisiana's Workers' Compensation Act, an employee injured in the course and scope of his employment due to his employer's or coworker's negligence cannot sue his employer in tort but is instead limited to receiving workers' compensation benefits. La. R.S. 23:1032. The exclusivity provision of the state's workers' compensation law applies not only to the direct employee-employer relationship but also to the borrowed employee relationship. *See, e.g., Griffin v. Wickes Lumber Co.*, 840 So.2d 591, 596 (La.App. 1 Cir. 12/20/02).

While there is no fixed test for borrowed-employee status, there are ten relevant factors that have been recognized by the Fifth Circuit as being helpful in determining whether borrowed servant status exists. *Id.* (citing *Ruiz v. Shell Oil Co.*, 413 F.2d 310, 312-13 (5th Cir.1969)):

> (1) Who has control over the employee and the work he is performing beyond mere suggestion of details or cooperation?
>
> (2) Whose work is being performed?
>
> (3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?
>
> (4) Did the employee acquiesce in the new work situation?

6

(5) Did the original employer terminate his relationship with the employee?

(6) Who furnished tools and place for performance?

(7) Was the new employment over a considerable length of time?

(8) Who had the right to discharge the employee?

(9) Who had the obligation to pay the employee?

(10) Who selected the employee?

No single factor, or combination of them, is determinative; although, in a number of prior cases, the Fifth Circuit has considered the first factor—control—to be the central factor. *See, e.g.*, *Melancon v. Amoco Prod. Co.*, 834 F.2d 1238, 1245 (5th Cir. 1988), *Capps v. N.L. Baroid–NL Indus., Inc.*, 784 F.2d 615, 616–17 (5th Cir.1986). In *Gaudet v. Exxon Corp.*, 562 F.2d 351, 356 (5th Cir.1977), the court, however, de-emphasized the control factor and stressed the importance of the fourth, fifth, sixth, and seventh factors.

Whether borrowed-employee status exists is a question of law but depends upon a fact-based inquiry *Brown v. Union Oil Co. of California*, 984 F.2d 674, 676–77 (5th Cir.1993); therefore, factual disputes must be resolved before the district court can make the necessary determination. *Hotard v. Devon Energy Production Co. L.P.*, 308 Fed. App'x 739, 741 (5th Cir.2009); *Melancon*, 834 F.2d at1245 n. 13. In this case, the Court finds that there are substantial unresolved factual issues that

preclude summary judgment in Castille's favor.

**(1) Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?**

As provided in the foregoing, the MSA between Castille and Apache states that "Mariner [Apache] shall have no direction or control over Contractor [Total Safety] or its employees [Castille]... except in the results to be obtained" *R. 161-4, ¶ 8.1*. Yet Apache argues that it had control over Castille and the work he was performing based on the fact that Apache gave Castille a "critical due date list" of platform inspections for each week. Thus, Apache contends Castille's work instructions came from Apache not Total Safety. Apache also contends that Castille slept on Apache's platforms and was required by Apache to attend various safety meetings—further evidence that Apache exercised control over Castille. Finally, Apache asserts that Apache's ability to instruct Castille to leave the platform on which he was working in order to perform a task on another platform demonstrates Apache's control over Castille. Apache cites the deposition of Castille, as well as the deposition and declaration of Michael Dronet, Castille's supervisor at Total Safety, in its representation to the Court Total Safety's confirmation that Apache "had the ultimate authority to dismiss Castille from its employment." *R. 161-1, p. 24*.

Castille argues that Apache's examples cited as "control" elements fail to comply with the determination of control over the employee as explained in *Ruiz*, 413

F.2d at 313. There, the Fifth Circuit stated, "[i]n considering whether the power exists to control and direct a servant, a careful distinction must be made between authoritative direction and control, and mere suggestion as to details or the necessary co-operation, where the work furnished is part of a larger undertaking." *Id.*

Guided by *Ruiz's* level of "control" required in the first factor, Castille argues that Apache's "list" of instructions given to Castille was merely the work that was required to be done on its platforms during that period. Apache makes no suggestion that it directed Castille specifically as to how or when his job was to be performed. Such an interpretation is consistent with the terms of the MSA which specifically states that the exception to Section 8.1's denial of Apache's "direction or control" over Castille is "in the results to be obtained." *R. 161-4, ¶ 8.1.* Apache's contention that its list of work for Castille to do during the week fails to establish that Apache had authoritative direction and control other Castille.

Nor does Apache's requirement that Castille sleep on the platform and attend safety meetings determine whether or not Castille was a borrowed employee. Many if not all of Apache's workers are requested to sleep on the fixed platform and to attend safety meetings while working there. (CITE?)

Apache's assertion that it had the right to tell Total Safety it did not want Castille on its platforms and to send someone else is not disputed by Castille or by Dronet's declaration or his deposition. There is no dispute that Total Safety, not

9

Castille, had a contract with Apache. As with any such master service contract, the contractor, in this case Total Safety, could send the employee it chose, and Apache could require that the contractor send a different employee. Apache's contention that it could fire Castille as a Total Safety employee, however, is not established by the testimony of Castille, *R. 161-7, p. 49*; and the testimony and/or declaration of Dronet is anything but clear in confirming such a contention. While Dronet *opined* that because Apache was such an important customer to Total Safety, "they [Apache] could ask for it [termination], and we would probably oblige it," *R. 161-12, pp. 84-85*, he conceded he had no knowledge of the MSA or of Total Safety's obligations to their own employees. *Id.* The Court finds Dronet's opinion as to whether or not Apache had the ultimate control of terminating Castille's employment from Total Safety to be speculative and unsubstantiated, thus failing to comply with Rule 56.[3] *Jenkins v. AEP River Operations, LLC*, 2012 WL 4210305, at *1 (E.D.La.,2012).

Ultimately, the record indicates that Castille was Total Safety's fire/safety technician sent to work on Apache's platforms. The examples cited by Apache as

---

[3] The Court notes that Castille contends Total Safety and Apache entered into an indemnity agreement whereby Total Safety is required to defend and indemnify Apache against lawsuits brought by its employees, in this case Castille. He argues that because of this agreement Total Safety and its employees, specifically Michael Dronet and Larry Solis, are aligned with Apache being found a borrowed employer so that Apache, and therefore Total Safety, will be immune from any liability apportioned to Apache. Castille asserts that Dronet and Solis' testimony and declarations contain self-serving and conclusory statements which contradict the actual circumstances in this case. Such alleged contentions will not affect the Court's application of Rule 56 of the Federal Rules of Civil Procedure to this Motion.

"control" factors are merely examples related to Apache being the owner of the platforms and the direction required to control the work on the platforms. Accordingly, the factual determination of who controlled Castille's work should be decided by the fact-finder unless the other factors overwhelmingly support Castille's borrowed employee status.

**(2) Whose work is being performed?**

Total Safety supplied workers to do Apache's work on its platforms, and Castille was allegedly injured while working on Apache's platforms. He was doing the work that his employer, Total Safety, hired him to perform as a fire, gas and navigational aid technician, *and* he was also helping to accomplish Apache's work on the fixed platforms; therefore, a factual dispute exists concerning the second factor.

**(3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?**

Apache argues there was a meeting of the minds between Apache and Total Safety as evidenced by the MSA, *R. 161-4, p. 1*, because "Total Safety employees were used to perform [sic] work on Apache's platforms." *R. 161-1, p. 25*. The MSA also states that "neither Contractor [Total Safety] nor anyone employed or engaged by Contractor [Castille] shall be deemed for any purpose to be the employee ... of

[Apache] in the performance of any work or service or part thereof in any manner." *R. 161-4, ¶ 8.1.*

Notwithstanding the express language of the MSA, courts have found that contract provisions similar to the one at issue here do not prohibit a finding of borrowed servant status where the workplace realities are otherwise. In *Brown v. Union Oil Co. Of California*, 984 F.2d 674, 677 (5th Cir.1993), the Fifth Circuit found that such contract provisions do not automatically prevent borrowed employee status from arising because the parties' actions in carrying out the contract can impliedly modify or waive the express provision. The Court held that conflicting evidence regarding whether the parties impliedly modified the contract raised a factual dispute that should be determined by a fact-finder. *Id a*t 678. The Court finds that a factual dispute concerning the third factor exists in this case.

**(4) Did the employee acquiesce in the new work situation?**

The focus of the fourth factor is "whether the employee was aware of his work conditions and chose to continue working in them." *Brown* at 678. In support of this factor, the defendant states that Castille acquiesced by accepting Total Safety's assignment for him to work on Apache's offshore oil and gas platforms as a fire and safety technician. There is no dispute that Castille agreed to work for Apache at the West Cameron platforms. *161-7, p. 37.* This factor weighs in favor of borrowed

servant status.

**(5) Did the original employer terminate his relationship with the employee?**

The fifth factor examines "the nature of the lending employer's relationship with the employee while the borrowing occurred." *U.S. Fire Ins. Co. v. Miller*, 381 F.3d 385, 389 (5th Cir. 2004). Apache concedes that Total Safety, Castille's original employer, did not sever his employment. Rather, Apache contends that Castille's relationship with Total Safety was so attenuated that the Court should find this factor weighs in favor of borrowed servant. Dronet testified that he did not oversee Castille's daily work but saw him about four to five times per month when he came in from a hitch and delivered his time sheets and inspection reports. *R. 161-12, p. 28*. Larry Solis, Total Safety Divisional Vice President stated that his only contact with Castille was administrative matters such as salary, payment and/or insurance and benefits. *R. 161-3, ¶ 17*.

Once again Apache emphasizes that Total Safety did not give Castille assignments related to his work for Apache. The relationship between Apache and Total Safety is stated in the MSA, "[Apache] shall have no direction or control over [Total Safety] or its employees [Castille] .... The work and services contemplated herein shall meet the approval of [Apache] and shall be subject to [Apache's] general right of inspection to assure the satisfactory completion thereof." *R. 161-3, ¶ 8.1*.

13

There are factual disputes with regard to this fifth factor.

**(6) Who furnished tools and place for performance?**

While the parties concur that the place for performance of Castille's work was Apache's platforms, Castille's and Apache's positions as to whether Apache or Total Safety supplied Castille's tools are diametrically opposed. Castille asserts that "[i]t is undisputed" that all of the essential and major tools used by Castille on Apache's platforms were provided by Total Safety or by Castille himself. On the other hand, Apache contends, "[i]t cannot be disputed that Apache, and not Total Safety" provided Castille's "'tools' within the meaning of federal jurisprudence." In support of its position, Apache cites *Raymo v. Cargill Inc.*, 2014 WL 545872, at *4 (W.D.La.,2014). There, the court found this factor favored borrowed employer status where the employer furnished the place of performance and the tools for working on mining equipment, and the plaintiff brought only a specialty wrench for his own convenience. *Id* at *4-5.

Here, Apache furnished Castille with the place of employment, meals, lodging, and transportation to and from work. Total Safety provided Castille with most of the tools he needed on the job. When Castille needed assistance with parts and equipment, plaintiff would check in with Dronet, his Total Safety supervisor. *R. 161-12, p. 28.* The Court finds the facts in this case are more similar to those in *McCarty*

*v. Vastar Resources, Inc.*, 2002 WL 1837918, at *5 (E.D.La.,2002) ("Vascar [the platform owner] furnished plaintiff with the place of employment, meals, lodging, and transportation to and from work. American Aero [plaintiff's employer] provided plaintiff with most of the tools he needed on the job."). The Court concludes that this factor is neutral.

**(7) Was the new employment over a considerable length of time?**

Castille was hired by Total Safety in September of 2010. *R. 161-7, p. 36.* On the date of his accident, Castille had worked for Total Safety for approximately two (2) years. *R. 161-6, ¶ 7.* The duration of Castille's work for Apache in the West Cameron field was approximately eight (8) or nine (9) months. *Id at p. 37.* Prior to working for Apache in the West Cameron Field, Castille had worked for Apache in Area 11 "for a good while." *Id.* An issue of fact exists as to the duration of Castille's work for Total Safety on Apache's platforms. If the length of time is determined to be considerable, it would weigh in favor of Castille as Apache's borrowed servant. *U.S. Fire*, 381 F.3d at 390.

**(8) Who had the right to discharge the employee?**

As to factor eight, Apache concedes it did not have the right to terminate Castille from Total Safety's employment. *R. 161-1, p. 31.* Apache, however, cites Dronet's testimony to suggest that Total Safety would very likely terminate the

15

employment of any person upon Apache's request. *Id.* As the Court discussed in factor 1, Dronet *opined* in his deposition testimony that Apache was such an important customer to Total Safety, "they [Apache] could ask for it [Castille's termination], and we would probably oblige it." *R. 161-12, pp. 84-85*. Just as the Court dismissed Dronet's opinion in considering factor 1, the Court will disregard Dronet's opinion under this factor. Such speculation and unsubstantiated assertions do not adequately substitute for specific facts showing a genuine issue for trial. This factor does not favor borrowed employee status.

**(9) Who had the obligation to pay the employee?**

It is undisputed that Total Safety remained Castille's direct employer while he was working on Apache's platforms and that Castille received his paycheck from Total Safety. Based on the testimony of Castille, Total Safety paid Castille based on time tickets he filled out "specifically for" and submitted every week to Total Safety through Dronet. *R. 161-7, pp. 46-47, 111*. Castille also filled out a separate field ticket providing his hours worked at each platform which he submitted to Apache and were signed by Apache. *Id.*

Citing the depositions and declarations of Dronet, Solis, and Landry, Total Safety employees, Apache contends that Total Safety billed Apache for Castille's labor. *R. 161-3. ¶ 20.* With the exception of Solis' declaration, *R. 161-3, ¶20,* Apache has not established that Plaintiff submitted his *time tickets* to Apache or that the *time*

16

*tickets* were verified by Apache. *R. 161-7, pp. 111, 46–47*; *R. 161-3, p. 3, ¶ 20*; *R. 161-6, p. 4, ¶ 24*; *R. 161-11*, p. 49; *R. 161-12, p. 65*. More significantly, this evidence fails to establish the procedure by which Total Safety billed Apache for Castille's work or whether Apache retained a percentage of the amount Total Safety paid and gave the rest to Castille. The Court finds there are issues of material fact as to this factor.

**(10) Who selected the employee?**

The last factor asks who selected Castile for his work. *See U.S. Fire*, 381 F.3d at 391. Although Total Safety hired Castille and assigned him to work on Apache's platforms, Apache was under no obligation to accept Castille and could have rejected the assignment. Consequently, this factor is indeterminate as to whether Apache was a borrowed employer.

After weighing the factors, this Court is unable to make a dispositive determination as to Apache's claim that Castille was its borrowed servant. Genuine disputes of material fact remain to be decided. Accordingly, the Court finds that the presence of disputed issues of material fact precludes summary judgment on the question of Castille's status as a borrowed employee.

*IV. Conclusion*

Based on the foregoing, Apache's Motion for Summary Judgment [Rec. Doc. 161] will be denied.

Thus done and signed this 27th day of June, 2017, at Lafayette, Louisiana.

_____
CAROL B. WHITEHURST
UNITED STATES MAGISTRATE JUDGE